# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
May 23, 2001 Session

## STATE OF TENNESSEE v. ASATA LOWE

**Direct Appeal from the Circuit Court for Blount County**
**Nos. C-11329, C-11330     D. Kelly Thomas, Jr., Judge**

---

**No. E2000-01591-CCA-R3-CD**
**September 16, 2002**

---

A Blount County jury convicted the Defendant of two counts of first degree premeditated murder and imposed concurrent sentences of life imprisonment without the possibility of parole. The jury also convicted the Defendant of especially aggravated robbery, and the trial court sentenced the Defendant to twenty-five years incarceration, to be served consecutive to the two sentences for first degree premeditated murder. The Defendant now appeals, raising the following issues: (1) whether the trial court properly instructed the jury on all lesser-included offenses raised by the evidence, (2) whether the trial court erred by refusing to instruct the jury on duress, necessity and accessory after the fact, (3) whether the trial court erred by allowing into evidence testimony regarding the Defendant's pending aggravated assault trial, (4) whether the trial court erred by allowing into evidence a magazine clip confiscated from the Defendant by police two months before the murders, (5) whether the trial court erred by refusing to find the sentencing provisions of the Tennessee homicide laws to be unconstitutional, (6) whether the Defendant's convictions for especially aggravated robbery and theft violated his right against double jeopardy, (7) whether the indictment was constitutionally defective on its face, and (8) whether there was sufficient evidence to convict the Defendant of the charged offenses. We affirm the judgment of the trial court, but remand for entry of a corrected judgment form in Count III of indictment number 11329.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

F. D. Gibson, Maryville, Tennessee, for the Appellant, Asata Lowe.

Paul G. Summers, Attorney General and Reporter; Patricia C. Kussmann, Assistant Attorney General; Michael L. Flynn, District Attorney General; Edward P. Bailey, Jr., Assistant District Attorney General; and Kirk E. Andrews, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Defendant, Asata D. Lowe, was charged in indictment number 11329 with the following crimes against Charles Hill: first degree premeditated murder, felony murder in the perpetration of a robbery, especially aggravated robbery, theft of property valued over $1,000, and felony murder in the perpetration of theft. A Blount County jury found the Defendant guilty of the following offenses against Charles Hill: first degree premeditated murder, felony murder in the perpetration of a robbery, and felony murder in the perpetration of a theft. At the close of the State's proof, the trial court dismissed the charges of robbery and theft. The trial court merged the two felony murder convictions into the first degree premeditated murder conviction.

In indictment number 11330, the Defendant was charged with the following crimes against Sammy Garner: first degree premeditated murder, felony murder in the perpetration of a robbery, especially aggravated robbery, theft of property valued over $1,000, and felony murder in the perpetration of theft. A Blount County jury convicted the Defendant of all charges in the second indictment. The trial court merged the two felony murder convictions into the first degree premeditated murder conviction and it also merged the theft conviction into the especially aggravated robbery conviction.

## I. FACTS

### A. State's Proof

Officer Robert Hubbard, a member of the Drug Task Force of the Blount County Sheriff's Department, testified that on October 16, 1998, he was at Shaggy's Market, a convenience store on Aluminum Avenue in Alcoa, Tennessee. According to Hubbard, late that afternoon the door to the store "opened and a young man fell through the door." Hubbard testified that the man was "bleeding from . . . his sides." Hubbard immediately dialed 911 and, at the same time, walked over to the victim and "did chest compressions" to keep him breathing. Hubbard testified that the victim was still alive when the ambulance arrived, but he appeared to be dying. Hubbard recognized the victim as Charles "Bill" Hill and stated that the victim "frequented" Shaggy's Market. Hubbard testified that Stacey's Place, also known as Stacy's Bar and Grill, was separated from Shaggy's Market by two dumpsters. Hubbard stated that Stacey's Place was not operated as a full-time business; however, parties were often held there.

Larry Sankey testified that at around 5:15 or 5:30 p.m. on October 16, 1998, he stopped at Shaggy's Market to buy a Coke, and as he started to walk out the door, he heard gunshots. Sankey recalled that approximately ten seconds later, he saw a man running towards him. According to Sankey, just as the man "got to the drive . . . it was just like he hit a brick wall . . . his hands went up." Sankey could tell that the man had been shot because "the blood just spurted . . . out his side."

Sankey testified that the man fell when he reached the side of Sankey's car in the parking lot, and less than a minute later, Sankey heard a car pulling out of the driveway to Stacey's Place. Sankey described the car as an "older, large" Oldsmobile or Pontiac, which was dark red or wine-colored. Sankey testified that he was sitting in his car when the wine-colored car pulled away from Stacey's Place. Sankey stated that his window was down and that the front windows of the wine-colored car were also rolled down. Sankey testified that he was able to see two individuals in the vehicle and he described them both as African-American males. Sankey stated that the driver had a dark complexion and that the passenger was "light-skinned." Sankey thought that the driver appeared to be shorter than the passenger. Sankey was unable to positively identify the Defendant in court as one of the men in the car.

According to Sankey, the car traveled down Aluminum Avenue, "[g]ot to the stop, took a left, went up to Hall Road and took a right." Sankey testified that the route that the vehicle took leads to Alcoa Highway. Sankey stated that he "went up the street[,] . . . looked both ways, turned, came back[,] . . . went to where the victim was . . . and waited on the police officers." Sankey testified that he did not see anyone else at Stacey's Place. When police officers arrived, Sankey gave them a description of the vehicle and the route that it had taken. Sankey stated that the car was moving "fast" when it pulled out of Stacey's Place.

Kevin Condee, a deputy sheriff with the Blount County Sheriff's Department, testified that on October 16, 1998, he was working as a patrol officer when he responded to a report that a major crime had occurred on Aluminum Avenue. Condee first went to Shaggy's Market, where he "saw a black male subject slumped over in the doorway of the business, with some other people around him." Condee testified that the man was "bleeding severely from the front part of his body. There was just a lot of blood." Condee stated that the man appeared to be "struggling . . . to breathe," but Condee could not tell if the man was conscious. Condee recognized the man as Charles "Bill" Hill.

Condee then spoke with Larry Sankey, who gave him information regarding a car containing passengers which had left the area of the crime. Condee immediately transmitted this information on the radio to other officers. Condee described the car as a "maroon or wine-colored Buick, four-door-type car," and he announced that the car was traveling on Hall Road towards the bypass area.

Condee testified that there was blood outside Shaggy's Market and that there was a "blood trail" between Shaggy's Market and Stacey's Place. Condee testified that a red car was parked in the garage behind Stacey's Place. Condee recalled that a telephone was laying on the ground near Stacey's Place.

Rodney Lovin, a deputy sheriff with the Blount County Sheriff's Department, testified that on October 16, 1998, he was employed as a patrolman with the Alcoa Police Department. Lovin testified that at approximately 5:45 p.m., he received a dispatch reporting a major crime on Aluminum Avenue in Alcoa. When Lovin arrived at the scene, Officer Condee was already there. At the scene, Lovin observed "a black male bent over in the doorway of Shaggy's Market. He was bent over on his knees. He was bleeding very badly from the front side of his body . . . ." Lovin

tried to speak to the victim; however, the victim did not respond. Lovin identified the victim as Charles Hill.

Lovin then located a trail of blood which led to Stacey's Place. The trail "went up to the left side of the parking lot, all the way back to underneath a carport area where a back door is." Lovin followed the blood trail and found in the carport a red vehicle with the motor still running. Lovin testified that he was also made aware of a telephone laying near the crime scene. Once Lovin entered Stacey's Place, he observed a male lying on his left side behind the bar with his hand underneath him and "what appeared to be an automatic weapon just a few inches from his body." Unsure if the person was alive, the officers told the person not to move. Upon further investigation, Lovin noticed what appeared to be a bullet wound near the person's jaw. After another officer moved the gun away from the person, Lovin lifted the person's arm and was not able to feel a pulse. Officers then radioed for another ambulance. The second victim was later identified as Sammy Garner.

Deputy Sheriff James L. Wilson of the Blount County Sheriff's Department testified that on October 16, 1998, he was a senior police officer with the Maryville Police Department and that he received a dispatch about a shooting on Aluminum Avenue. He and two other officers went to the crime scene to assist the Alcoa Police Department. Wilson first went to Shaggy's Market, where he recognized Charles Hill in the doorway. Wilson testified that Hill was in distress; according to Wilson, Hill was on his knees "bleeding profusely." Wilson heard Hill "gurgling, attempting to breathe." Wilson stated that Hill appeared to have gunshot wounds to the front portion of his body.

Wilson then followed a trail of blood to Stacey's Place. Wilson testified that he and Sergeant Brooks went inside Stacey's Place. Wilson observed a bullet hole in the glass portion of the doorway leading to the carport. Wilson testified that Brooks noticed a person and a gun. Unsure if the person was alive, Brooks called for assistance. The weapon was removed and secured. Wilson then testified that one officer checked the victim and found no signs of life. Wilson testified that the gun laying next to the victim was a semi-automatic Glock pistol. Wilson also testified that a bullet was laying next to the gun. Wilson later saw a telephone laying on the ground. Wilson testified that the phone was "directly out from the entrance of Stacey's, l[a]ying in the middle of the road."

Sergeant Steve Brooks of the Alcoa Police Department was also called to the crime scene on Aluminum Avenue. Brooks testified that he entered Stacey's Place through the carport. Brooks recalled that the room he entered was very dark. Brooks looked behind the bar, saw a pair of feet wearing work boots, and warned the other officers. Brooks testified that he then got on top of the bar because he was not sure if the victim was dead. Brooks recognized the victim as Sammy Garner. Brooks then checked the victim for signs of life and called an ambulance. Brooks also observed a gun that was in a "locked and loaded position" and a bullet beside the victim.

Captain Lowell H. Ridings, Jr., testified that he is in charge of the Criminal Investigations Division of the Alcoa Police Department. On the day of the offense, Ridings went to Stacey's Place to perform a "sweep" and to search for evidence of a crime. Ridings stated that the scene "[k]ind of looked like chaos," and he surmised that there had been a shooting. According to Ridings,

Garner's body was behind the counter. Near Garner's body, Ridings found a .40-caliber Glock pistol containing a magazine and "nothing in the breech." Ridings also observed a .40-caliber unfired shell laying against the edge of the counter. Ridings examined the gun and determined that it had not been recently fired.

Ridings also found five ejected, fired .45-caliber shells. Three of the shells were located near the door, one was near the corner of the bar, and one was behind the bar. Ridings stated that there were indications that a bullet had penetrated the door; however, officers were unable to find a bullet at that location. Ridings observed on the counter "about a double bread pan full of aluminum foil . . . which contained a white powder substance." Near the powdery substance, Ridings found a set of digital scales which he stated are used to weigh small objects in grams.

Derrick Swenson, a patrol officer with the Alcoa Police Department, testified that on October 16, 1998, he was called upon to assist Captain Ridings in investigating the crime scene at Stacey's Place. Swenson testified that "on the counter top" inside the bar he observed one open container of cocaine in aluminum foil. Also on the bar was a zip-lock bag containing a powdery substance. Inside a vending machine, officers found "several baggies of what appeared to be . . . a large quantity of crack cocaine." Nine "baggies" of powder cocaine were found in the bottom of the vending machine.

Ernest Kemper, III, a patrol officer with the Alcoa Police Department, testified that on October 16, 1998, he was working as a uniformed police presence at the Clayton Homes Show located on Alcoa Highway. Kemper was in a marked police vehicle. According to Kemper, around 5:30 or 5:45 p.m., he received an emergency dispatch that there had been a shooting on Aluminum Avenue. The dispatch informed officers that the suspect vehicle was a maroon car occupied by two black males. Kemper testified that within a minute of the dispatch, he observed a vehicle matching that description pass by him on Alcoa Highway. Kemper stated that the driver of the vehicle had darker skin than the passenger. Kemper got into his patrol car, pulled behind the vehicle, and called in the license plate to the police department. Kemper was informed that the tag on the car was not on file. Kemper testified that he then activated his lights and siren and tried to initiate a traffic stop. However, the maroon car continued to accelerate. Kemper testified that the suspect vehicle was traveling at a rate of speed that was at least seventy miles per hour.

Kemper recalled that as his car and the vehicle driven by the suspects neared the Blount and Knox County line, he was not able to receive radio transmissions. The suspect vehicle turned onto Woodson Drive in Knox County. Kemper testified that the vehicle slowed, and the driver's door opened. Kemper drove alongside the vehicle so that the suspects could not flee. Kemper testified that when the cars were right beside each other, the passenger appeared to have a firearm pointed at Kemper. At this point, the suspect vehicle had almost stopped, and Kemper stated that in order to prevent the passenger from shooting, Kemper fired at least one round from his service pistol.

Kemper testified that he then tried to force the suspect vehicle off the road by hitting the rear of the suspect vehicle. The suspect vehicle went through an intersection and was struck by a

southbound station wagon. Kemper testified that he believed that his car hit the suspect vehicle again after the first collision. Kemper recalled that the driver exited the vehicle through the rear passenger door and "made a movement with his hands into his waistline." Kemper testified that he told the driver to put his hands in the air, but the driver did not comply. Kemper stated that the driver then made a "sudden movement from his waist towards [Kemper]," so Kemper shot at the driver. The driver fell to the ground. Kemper testified that the passenger tried to get out of the car, but Kemper sprayed him with a chemical spray in order to subdue him. Kemper did not see any weapons on either suspect. More officers soon arrived, and the suspects were transported to a hospital.

At trial, Kemper identified the Defendant as the driver of the suspect vehicle. Kemper testified that he believed that the Defendant was wearing "a pair of camoflauge britches . . . and a red shirt and a bullet proof vest under his red shirt." Kemper identified the passenger of the suspect vehicle as Brian Whitman. Kemper admitted that during the chase, the men could have thrown a weapon from their car without him noticing.

David Gilliam, M.D., the Blount County Medical Examiner, performed autopsies on both victims in this case. Gilliam testified that Garner suffered a gunshot wound to the top of his head and a gunshot near the right corner of his mouth. Gilliam determined that neither of the wounds were "contact wounds."

Gilliam testified that Hill suffered a gunshot to his right back, which penetrated his right lung and hit his heart. Gilliam reported that Hill also suffered a gunshot wound to his left back. Gilliam stated that Hill died of massive blood loss. Gilliam also noted that Hill was probably moving when he was shot.

Greg McCallie testified that on the afternoon of October 16, 1998, he was in Howe Street Park in the Hall-Oalfield community in Alcoa with Charles Hill and Sammy Garner, Jr. McCallie testified that Garner owned an establishment called Stacey's Place and that Garner lived in an apartment above the shop. According to McCallie, Garner kept cocaine in the ceiling of the kitchen and a gun underneath the counter behind the bar. McCallie stated that sometime before sundown on October 16, 1998, Garner asked McCallie to transport him to Garner's bar on Aluminum Avenue because he was having car trouble. McCallie told Garner that he could not go because he had his nephews in the park with him. At that time, Hill offered to take Garner to his bar.

Myron Lea Kellogg testified that on October 16, 1998, Garner also asked him for a ride. Kellogg stated that Garner needed his help to make a drug deal. Kellogg testified that Garner told him that he had cocaine. Kellogg further testified that on or about October 14, 1998, he went with Garner to Atlanta, Georgia, where Garner purchased a kilogram (thirty-six ounces) of cocaine for $27,000. According to Kellogg, when Garner returned to Stacey's Place, he placed the cocaine in the ceiling of the kitchen. Kellogg recalled that Garner kept a .40-caliber gun behind the bar at Stacey's Place. Kellogg testified that he had witnessed "about a thousand" drug deals, and he had never seen anyone wear a flak jacket or a bullet-proof vest to the transactions.

Seneca Toure Teeter was also in Howe Street Park in Alcoa on October 16, 1998. Teeter testified that while in the park, Garner borrowed his cell phone to make a call. Teeter stated that Garner stayed on the phone for approximately ten minutes, but Teeter was not able to hear the conversation. According to Teeter, just before leaving, Garner stated that he was "about to go make a sale and he would be back in a little bit."

Brian Whitman testified that on October 16, 1998, the Defendant asked Whitman to ride with him to Alcoa. Whitman stated that he decided to go with the Defendant because he wanted to see Sammy Garner. According to Whitman, the Defendant was wearing a bullet-proof vest when they left to go to Alcoa. Whitman stated that he had never seen the vest before. Whitman testified that the Defendant was driving Jamal Tory's "burgundy 98" Oldsmobile. Whitman recalled that when they arrived at Garner's club, nobody was there. After a few minutes, a small red car pulled up to the club. Whitman stated that Hill was driving and Garner was in the passenger seat. Whitman testified that he knew Garner but that he did not know Hill.

Whitman testified that both cars parked in the carport. According to Whitman, everyone got out of the cars except Hill, who "came in maybe a minute after [everyone else] came in." Whitman recalled that he talked to Garner and that everyone was friendly. Whitman stated that the Defendant and Garner began to talk, but he recalled that the Defendant and Hill did not even look at each other. Whitman testified that once everyone was inside, he asked to use the phone, and he took the phone outside to make a call. Whitman testified, "By the time I got outside to use the phone, I heard four gunshots." Whitman stated that he "threw [the phone] down and ducked out of the way when [he] saw Mr. Hill run out the door." According to Whitman, Hill ran down the street towards the convenience store. Whitman then saw the Defendant run out of the building with something that looked "[l]ike a little plastic Kroger bag." Whitman testified that the Defendant got into the driver's side of the vehicle and Whitman got in on the passenger's side. Whitman stated that the Defendant threw the bag in Whitman's lap and said that "they tried to kill him."

Whitman testified that the Defendant left Stacey's Place, driving "fast" past Shaggy's Market towards the highway. Whitman stated that he looked in the bag and saw that it was "full of dope." Whitman threw the bag onto the back seat and then he climbed onto the backseat. Whitman testified that he stuffed the bag into the backseat, "[b]ehind the armrest." Whitman climbed back onto the front seat and saw a gun laying beside the Defendant. Whitman then saw a police officer on the side of the road get into his patrol car and warned the Defendant. According to Whitman, the Defendant said that he could not pull over "[b]ecause that's how [he] got caught the last time." Whitman estimated that it took the police officer approximately two minutes to catch up to their vehicle and turn on his lights and siren. Whitman stated that he last saw the gun right before the police officer pulled behind their car. Whitman testified, "And then after he was behind us for so long, [the Defendant] attempted . . . . to pull over or confuse the police officer or lose him or whatever." The Defendant then turned onto a side street. Whitman stated that by the time the Defendant turned, "the policeman had shot at [them]. He let two rounds off at [them]."

Whitman testified that at some point, the police car "rammed into the back of" their car, which "pushed [them] through the intersection." Whitman stated that their car "fishtailed" and was hit by another car. According to Whitman, the Defendant began climbing out of the driver's side door and ran around to the back of the vehicle, at which time the officer, who was also out of his car, "let off two more shots." The Defendant then laid down on the ground. Whitman testified that he remained in the car, and the police officer sprayed him in the face with "mace, pepper spray or whatever it was" so he "couldn't see anything." Officers pulled Whitman out of the car and he laid on the ground. Whitman recalled that his left knee was cut during the incident.

Whitman testified that the Defendant told him that he was going to Alcoa to buy cocaine. Whitman maintained that he did not want to be involved in a drug transaction, but that he just rode with the Defendant so he could see Garner. Whitman testified that he deliberately did not pay attention to the conversation in the club. Whitman testified that the Defendant owned a .45-caliber pistol with a "pointer" or laser sight on it. Whitman identified the gun recovered from the highway median as the Defendant's gun. Whitman testified that the Defendant always carried that gun, and Whitman just assumed that the Defendant had it with him when they went to Alcoa.

Charles "Chuck" Lassetter, an officer with the Knox County Sheriff's Department, testified that the police department towed the suspect vehicle to the City County Building, where it was turned over to detectives. According to Lassetter, the car was registered to Jamal Tory.

Brad Park, a crime scene technician with the Knox County Sheriff's Office, performed the final search of the suspect vehicle. Park testified that he also fingerprinted the vehicle and took photographs of the vehicle. Park testified that during his search, he found a bullet in the vehicle frame. Park also testified that he found a white plastic shopping bag "underneath the armrest between the insulation and the frame of the trunk." Park believed that someone would have to make an effort to put the bag where it was found. Inside the shopping bag, Park found four separate ziplock bags containing a white powdery substance. Park testified that no prints were found on the bags; however, Brian Whitman's fingerprints found were on the rearview mirror.

Celeste White, a drug chemist with the Tennessee Bureau of Investigation (TBI), testified that she received four bags of white powder from the Knoxville Police Department. White understood that the bags had been recovered from the suspect's car. White analyzed the substance and determined that the substance weighed 475.6 grams and contained cocaine.

Carl Smith, a forensic scientist with the TBI, analyzed powder that was obtained from the crime scene. According to Smith, the sample contained 312.6 grams of cocaine hydrochloride, which is commonly referred to as cocaine, and 82.4 grams of cocaine base, which is commonly referred to as crack cocaine. Smith testified that some of the bags he received to test contained powdered sugar.

John Casale, a research chemist with the Drug Enforcement Agency (DEA), examined the cocaine taken from the suspect car and from the crime scene. Casale testified, "I reached the

conclusion that all fourteen bags were from the same batch of cocaine." Casale stated that the cocaine came from Peru and was ninety-eight percent pure.

Deputy Sheriff Russell Hatcher of the Blount County Sheriff's Department participated in a law enforcement "sweep" of the median strip of Alcoa Highway on October 19, 1998. Hatcher testified that during the sweep, he found a black, semi-automatic handgun with a magazine in it. Hatcher believed that the gun was loaded, but he was not sure. Captain Lowell H. Ridings, Jr., testified that the gun later found in the median of Alcoa Highway had five rounds in the magazine.

Joseph Huckleby, an investigator in the Criminal Investigations Division of the Knoxville Police Department, testified that on September 9, 1998, approximately one month before the crimes in this case, he was working patrol when he recognized a man who had pending warrants against him. The man was in a vehicle with two other men. Huckleby approached the vehicle, arrested the suspect, and performed a "security pat-down" on the other occupants of the vehicle. The Defendant was one of the occupants. Huckleby found a .45 Glock magazine containing ten rounds in the Defendant's front pants pocket. The Knoxville Police Department confiscated the magazine.

Harvey McGill testified that on October 16, 1998, he was driving home from work around 5:40 p.m. McGill testified that the traffic was heavy and that he was in a turn lane when he spotted what he thought was a toy pistol laying on the ground. McGill testified that he opened his car door, reached down, and picked up the gun. McGill then realized that he had found a nine-millimeter pistol with a magazine. McGill testified that it looked as though the gun had been run over a couple of times. McGill took the magazine out of the gun and noticed that the gun was loaded and ready to fire. McGill wrapped the gun in a tee-shirt and left. When McGill read about the shooting on Aluminum Avenue in the paper, he contacted the District Attorney General, who notified the Alcoa Police Department. The police retrieved the gun shortly thereafter.

Oakley McKinney, a forensic scientist with the TBI, analyzed the two pistols found in connection with this case. McKinney testified that he found no latent prints on one of the guns and no identifiable latent prints on the other. McKinney stated that the nine-millimeter pistol had debris on it.

Tom Heflin, a forensic scientist with the TBI, testified that he specializes in firearms identification. Heflin examined the two guns associated with this case. Heflin also examined the Glock magazine that was confiscated from the Defendant a month prior to the crime. Heflin testified that the magazine that was submitted with the Glock pistol and the magazine confiscated from the Defendant were basically the same. Heflin acknowledged that there was no indication that the Defendant's magazine had been in that particular gun. However, Heflin determined that three of the cartridges in each magazine were "produced in the same lot of ammunition, which means that they could have very well possibly have been boxed in the same box of ammunition." Heflin also testified that two of the fired cartridge casings found at the scene and the six cartridges in the two magazines confiscated from the Defendant "had been produced by the same bunter tool." Heflin noted that usually when Glock pistols like the one in this case are sold to the public, they are sold

with two magazines, each with a ten-round capacity. Both of the magazines that Heflin examined had a ten-round capacity.

Kathleen Lundy, an examiner in the Federal Bureau of Investigation laboratory, testified that she specializes in "elemental analysis and comparison of bullet and shot pellet lead specimens." Lundy testified that she performed a "comparative bullet lead analysis" in this case. Lundy explained that "when you analyze two bullets, if you find the same chemical composition, the conclusion is that they are from the same batch or pour or melt of lead." In this case, Lundy compared two bullets retrieved from Garner's body, one bullet from the crime scene, a cartridge from the Glock pistol found in the median of the highway, four "test fires" from the Glock pistol, and the magazine that was confiscated from the Defendant. Lundy "found a total of three different compositions of lead represented by all the specimens analyzed." Lundy determined that the two bullets from Garner's body, the bullet from the crime scene, seven cartridges from the confiscated magazine, and five cartridges from the magazine in the Glock pistol had "analytically indistinguishable compositions."

Captain Daniel Neubert, Jr., of the Blount County Sheriff's Department testified that he is the Facility Administrator for the Corrections Division. According to Neubert, the Defendant had $38 and Whitman had no money when they were brought to the Blount County Jail on October 16, 1998.

Terrence Long testified that at the time of trial he was an inmate in the Blount County Jail, and had talked to the Defendant while the Defendant was incarcerated. Long recalled that someone asked the Defendant if he knew Sammy Garner. Long testified that the Defendant replied, "Oh, that punk-ass bitch." Regarding the last time the Defendant saw Garner, the Defendant stated, "Yeh, I remember that punk-ass bitch when I seen his brains splatter." Long testified that he and the Defendant were arguing when the Defendant made the statements about Garner. Long stated that he could not see the Defendant from his cell, but maintained that he knew that the Defendant made the statements because the person making the statements responded to the name "Asata." Long testified that he lived with Garner for ten years when his mother was married to Garner's father. Long stated that he had previously been to Stacey's Place and that he also knew Hill.

Dominic Rashad Kellogg testified that he was an inmate in the Blount County Jail at the time of the trial in this case. Kellogg testified that on October 16, 1998, he saw Garner at the home of a man named Jack. Kellogg stated that he noticed a gun in Garner's pocket and asked him what was going on. Garner said that he was going to sell a half of a kilogram of cocaine and left. Kellogg asked Garner to whom he planned to sell the cocaine, and Garner responded, "I don't know, I [have] never seen them before." Kellogg testified that Garner left Jack's house and walked toward a pavilion in the park.

Kellogg testified that he also knew the Defendant from the Blount County Jail. Kellogg recalled that he "cursed [the Defendant] almost everyday" regarding Hill and Garner. Kellogg testified that "[a]fter a couple of days, [the Defendant] finally said, 'I watched that bitch-ass nigger's

brains splatter out of his head.'" According to Kellogg, the Defendant also said, "If Charles Hill wouldn't have never been there, this wouldn't have never happened." Kellogg further testified that the Defendant stated that because the Defendant shot Hill in 1995, "[the Defendant] figured that they would get him before he got them." Kellogg testified that although he shared a cell with Terrence Long, the arguments between the Defendant and Long occurred before Kellogg became incarcerated or moved into the cell with Long. Kellogg testified that he also knew Hill.

Detective Dale Boring of the Alcoa Police Department testified that he was a witness for the State in an aggravated assault case in which the Defendant was accused of shooting Charles "Bill" Hill. According to Boring, Hill testified at the preliminary hearing, and the Defendant was present in the courtroom during Hill's testimony. The trial was subsequently set for November 10, 1998, but the case was dismissed when Hill was killed. Boring testified that $3.48 was recovered from Hill's clothing and that $71.00 was recovered from Hill's vehicle.

## B. Defense Proof

The Defendant testified that he graduated from high school and joined the Army, where he was a computer programmer from August 1992 until January 1995. At the time of the crime, the Defendant was attending Pellissippi State. The Defendant testified that he had known Whitman for about a year prior to the murders and that they saw each other once a week. The Defendant testified that he is five feet, five inches tall and that Whitman is approximately six feet, two inches tall. The Defendant stated that he introduced Whitman to Princeton Wells and that Whitman bought a .45 Glock pistol with a "laser beam" on it from Wells about five to eight months before the crime. The Defendant testified that Whitman carried the gun with him at all times.

The Defendant recalled that around noon on October 16, 1998, he was at Keathy Smith's house. The Defendant had gone to Smith's after leaving his girlfriend's house, which was located near Smith's house. The Defendant explained that his car had been impounded the previous night because the tags were expired. The Defendant testified that sometime between noon and one o'clock that afternoon, Whitman and Kenny Jamal Tory also arrived at Smith's house. The Defendant stated that Whitman drove Tory's car and took the Defendant to the impound lot to retrieve his car. After retrieving the car, both men returned to Smith's house. The Defendant testified, "When I first asked [Whitman] to go take me to go get my car at the impound [lot], [Whitman] asked me would I take him to Alcoa to see Sammy Garner."

The Defendant testified that they returned to Smith's house from the impound lot at approximately 2:00 p.m., but they did not leave for Alcoa until after 4:00 p.m. because Whitman had been "trying to page . . . Garner." Jamal Tory gave the Defendant and Whitman directions to get to Stacey's Place. According to the Defendant, Whitman asked to borrow Tory's 1998 four-door Oldsmobile because the motor in the Defendant's car began "ticking" on the way back from the impound lot. The Defendant testified that he drove because Whitman did not have a driver's license. The Defendant stated that Whitman told him that he was going "to talk about some musical equipment or to pick up some musical equipment or something like that."

-11-

The Defendant testified that on the way to Stacey's Place, he missed a turn and ended up at a Texaco gas station. The Defendant stated that he and Whitman attempted to call for directions, but the phone did not work so they drove down the street to a Food Lion grocery store to use the phone. The Defendant recalled that Whitman dialed Tory's number, but the Defendant talked to him. The Defendant testified that when they finally arrived at Stacey's Place, he pulled into the back part of the carport. Not finding anyone else there, the Defendant left the car engine running. The Defendant testified that Whitman got out of the car and told the Defendant, "I'll be right back." However, a few minutes later, the Defendant saw a "little red car" drive up to Stacey's Place. According to the Defendant, Hill was driving the car, and Garner was in the passenger's seat. Hill parked the car beside the car that the Defendant was driving. The Defendant testified that it did not bother him that Hill was there and that he had met Garner a couple of times previously through Tory. The Defendant testified that Whitman and Tory were best friends, and he recalled that Tory had previously indicated that Garner was Tory's cousin.

The Defendant testified that after Hill and Garner arrived at Stacey's Place, he still did not turn the car engine off. The Defendant stated that he stayed in the car while Whitman, Hill and Garner all went inside Stacey's Place. The Defendant recalled that everyone appeared to be friendly with one another.

The Defendant testified that after everyone went inside, his pager went off, so he went inside to use the telephone. According to the Defendant, Garner handed Whitman a phone from behind the counter, and Whitman handed the phone to the Defendant. The Defendant explained that he went outside to make his phone call because he wanted some privacy. The Defendant stated that he planned to sit on the car to make the phone call, but he had to step out into the light to see the number on his pager. He stated, "[T]hat's when I heard the first two gunshots." The Defendant testified that the first two shots were more muffled than the following shots.

The Defendant recalled that he "immediately ran back towards the two parallel parked cars," but he "tripped and fell and the phone came out of [his] hand." The Defendant then noticed that the door to the club had been opened. The Defendant testified that he reached up to the car door and jumped into the back seat. According to the Defendant, he landed on a bullet-proof vest, put the vest on over his shirt, and "balled up" in the back seat of the car. The Defendant testified that Whitman jumped in the passenger seat of the car and asked the Defendant what he was doing. The Defendant stated that he asked Whitman what happened, and Whitman responded that "Dude shot him." The Defendant testified that Hill had braids in his hair and that Whitman told him that the man with braids shot Garner. The Defendant testified that Whitman, who had a gun when he got in the car, struck the Defendant in the head with the gun and said, "Nigger, you need to get me back to Knoxville . . . ." The Defendant stated that he then got in the front seat and drove.

The Defendant testified that Whitman told him that Hill and Garner were arguing and then Hill "just pulled out the gun and shot [Garner] and ran out [of] the club." The Defendant drove past Shaggy's Place, but stated that he did not remember seeing anything unusual. The Defendant testified that he stopped at the stop sign at Aluminum Avenue and put his shirt on over the bullet-

proof vest. The Defendant reported that he told Whitman that he wanted to go back to get Garner. According to the Defendant, Whitman asked him why and then said no. The Defendant stated that he then headed towards Alcoa Highway, but he "didn't have much to say to [Whitman]" because he was "way too upset." At this time, according to the Defendant, the gun was in Whitman's lap.

The Defendant testified, "[W]hen we passed by the police, [Whitman] took the gun and he put it . . . in his waist and he grabbed a bag that was on the floor in front of him by his feet . . . and jumped in the back seat with it." He stated, "I guess that had . . . to be when he stuffed the drugs in the back seat." The Defendant stated that Whitman did not tell him what was in the bag and that Whitman did not have the bag when he went into Stacey's Place. The Defendant testified that Whitman told him, "If the police get[] behind us . . . I'm going to shoot you if you pull over." The Defendant recalled that after a minute or two, Whitman crawled onto the front seat. The Defendant testified that he did not see the gun when Whitman crawled onto the front seat, but stated that there was a "bulge" in Whitman's clothing where the gun could have been.

The Defendant testified that after the traffic thinned, he saw a police car behind them, but he did not notice the lights or siren. The Defendant stated that he wanted to find a way to stop without crashing or getting shot, so he turned right onto Woodson Drive. The Defendant maintained that he allowed the police to catch up to his vehicle because he "didn't want to lose them." The Defendant testified, "[The police officer] rammed us . . . [a]nd then he shot at us and then he rammed us again right on through the stop sign. And then we crashed, we wrecked." When the car the Defendant was driving came to a stop, it had spun around and was facing the opposite direction.

The Defendant testified that the police car pulled up "door-to-door" with their vehicle, so the Defendant jumped over the back seat and climbed out of the passenger door. The Defendant observed the police officer slide across his seat and get out of his passenger side door. The Defendant testified that the officer "shot at [him]," so the Defendant "laid on the ground." The Defendant stated that the officer then "maced" him, slammed him into the back windshield, threw him on the ground, and handcuffed him. The police took the Defendant to the hospital and then to the Alcoa Police Department.

When asked if he knew about the cocaine, the Defendant replied, "No, not really. I knew [Whitman] put something . . . I knew he was doing something with a bag in the back seat, but as to what, I really couldn't say then." The Defendant maintained that he would not have gone to Alcoa if he had known about the drug transaction. The Defendant testified, "I don't mess with [drugs] and I don't sell them." He also testified that his mother was addicted to drugs and died at an early age. Finally, the Defendant testified that while in jail he had arguments with Terrence Long and Dominic Rashad Kellogg and that they accused the Defendant of killing their friends.

Princeton Wells testified that he knew both the Defendant and Whitman. Wells stated that he sold a .45-caliber Glock pistol with two magazines to Whitman a couple of years before the trial. Wells testified that he had not met Whitman before he sold the gun to him and stated that the Defendant brought Whitman to Wells' house. Wells responded that he bought the gun, as well as

a laser sight for the gun, at a gun show. Wells testified that he was a State's witness in a prior trial against the Defendant.

Scotty Anderson testified that he was an inmate in the Blount County Jail and recalled that he and the Defendant were housed in the same cell between March and June 1999. Anderson testified that he also knew Dominic Rashad Kellogg and Terrence Long. Anderson testified that he heard heated arguments between the Defendant, Kellogg, and Long. According to Anderson, Kellogg and Long were "talking crazy to [the Defendant]." Anderson testified that when Kellogg and Long accused the Defendant of killing Garner and Hill, the Defendant "just shook it off and said, you're crazy, you know, and just walked off." Anderson stated that he never heard the Defendant make any statements to Long or Kellogg indicating that he had any knowledge about the killings. Anderson admitted that he had a longstanding problem with drugs, alcohol, and sniffing paint.

Clinton Andrew Hacker testified that he was an inmate in the Blount County Jail, where he was housed in a cell with the Defendant for approximately one month. Hacker stated that he also knew Terrence Long and Dominic Rashad Kellogg. Hacker recalled that there was quite a bit of "bickering" between the Defendant and the other inmates. Hacker testified that they would "yell[] and scream[] at each other." Hacker testified that he never heard the Defendant talk about killing either of the victims.

Jason D. Love testified that he lives in Alcoa and was housed in the same jail cell with the Defendant during the summer of 1999. Love stated that he let the Defendant believe that he was from New York so that the Defendant would tell him about the incident. According to Love, the Defendant said that he went to Stacey's Place because "he was going to get something" from Garner, and then "he recognized somebody who he shot like a year or two ago." Love stated that the Defendant said he "knew something was funny because . . . both of them walked into the kitchen." According to Love, the Defendant said that he thought Hill and Garner were going to get the drugs, but that while the Defendant was inside Stacey's Place, "he heard something cock." Love testified that the Defendant "said he figured the guy recognized him when he walked in, so he had to get them first. He said when he walked out, he had to do what he had to do." Love acknowledged that the Defendant never stated what he had to do. Love testified that the Defendant told him "not to say nothing."

Donnie Bridges testified that he was an inmate in the Blount County Jail with Love. He testified that he had an argument with Love because Bridges "associated with" the Defendant. According to Bridges, Love said that the Defendant had killed his friend.

## II. ANALYSIS

### A. Jury Instructions

### 1. Lesser-Included Offenses

-14-

The Defendant argues that the trial court erred by failing to charge the jury on the lesser-included offenses of voluntary manslaughter, criminally negligent homicide, and reckless homicide. Initially, we note that voluntary manslaughter is a lesser-included offense of first and second degree murder. State v. Dominy, 6 S.W.3d 472, 477 n.9 (Tenn. 1999). In addition, we note that the offenses of reckless homicide and criminally negligent homicide are lesser-included offenses of felony murder under part (b) of the Burns test. State v. Curtis Jason Ely, No. E1998-00099-SC-R11-CD, No. E1999-00170-SC-R11-Cd, 2001 Tenn. LEXIS 600, at *29 (Tenn., Knoxville, June 5, 1999); see generally State v. Burns, 6 S.W.3d 453, 469 (Tenn. 1999). However, the trial court is not required to instruct the jury on all lesser-included offenses. Determining whether a lesser-included offense must be charged in the jury instructions requires the following two-part inquiry:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Burns, 6 S.W.3d at 469.

We thus turn to consideration of whether "any evidence exists that reasonable minds could accept as to the lesser-included offense[s]." Id. Recently, in State v. Allen, 69 S.W.3d 181, 189 (Tenn. 2002), our supreme court determined that the "jury is not required to believe any evidence offered by the State," and held that the authority of the jury to convict on a lesser included offense may not be taken away, even when proof supporting the element distinguishing the greater offense from the lesser offense is uncontroverted. Our high court reiterated that "'[t]he jury, not the judge, performs the function of fact-finder.'" Id. (quoting State v. Burns, 6 S.W3d 453, 472 (Tenn. 1999)). Further, the court determined that "the Burns analysis does not preclude a finding that the same evidence supports an instruction on both the greater offense and the lesser offense. Id. at 188.

In this case, the evidence adduced at trial established that the defendant traveled to Stacey's Place to effectuate a drug transaction with Sammy Garner. The evidence also showed that the defendant wore a bulletproof vest and carried a gun. Shots were fired inside the establishment and the defendant ran to the car in possession of almost half of a kilogram of cocaine he had taken from the interior of Stacey's Place. Using the Burns analysis, the evidence was sufficient to support an instruction on the offenses of reckless homicide, criminally negligent homicide, and robbery. The evidence would also be legally sufficient to support convictions for these offenses. Thus, the offenses should have been included in the instructions.

The state argues on appeal that because the defendant did not claim at trial that he shot the victims after adequate provocation, the trial court was not required to instruct the jury on the lesser included offense of voluntary manslaughter. Our supreme court, however, has held that "[t]he trial court must provide an instruction on a lesser-included offense supported by the evidence even if such instruction is not consistent with the theory of the State or of the defense. The evidence, not the

-15-

theories of the parties, controls whether an instruction is required." <u>Allen</u>, 69 S.W.3d at 188. Here, several witnesses testified that the defendant told them that the victims "tried to kill him," and that the defendant felt as though he had to "get" the victims before they killed him. Under these circumstances, the evidence warranted an instruction on voluntary manslaughter.

Having determined that the trial court was required to instruct the jury on the lesser included offenses of voluntary manslaughter, reckless homicide, criminally negligent homicide, and robbery, the next inquiry is whether the error was harmless. In <u>State v. Williams</u>, 977 S.W.2d 101, 105 (Tenn. 1998), our supreme court rejected a line of cases which had concluded that the right to instructions on lesser offenses was founded in the Tennessee Constitution and instead ruled that entitlement was based solely upon the statutory requirement. <u>Id.</u> Consequently, the high court directed that any error in the omission of a lesser included offense would be subject to the following harmless error analysis:

> Reversal is required if the error affirmatively appears to have affected the result of the trial on the merits, or in other words, reversal is required if the error more probably than not affected the judgment to the defendant's prejudice.

<u>Id.</u>

In <u>State v. Bolden</u>, 979 S.W.2d 587, 593 (Tenn. 1998), our supreme court emphasized the mandate of the statute requiring trial courts to "instruct the jury on all lesser offenses if the evidence introduced at trial is legally sufficient to support a conviction of the lesser offense." Our high court also acknowledged that the "purpose of the statute is to protect the right to trial by jury by instructing the jury on the elements of all offenses embraced by the indictment [and to] facilitate the overall truth-seeking function of the process." <u>Id.</u> If the failure to charge a lesser included offense was an error of constitutional dimension, as <u>Bolden</u> implied, the proper question would have been whether the error was harmless beyond a reasonable doubt.

In <u>State v. Swindle</u>, 30 S.W.3d 289, 293 (Tenn. 2000), however, our supreme court followed the rationale in <u>Williams</u> and held that reversal was required only "if the error affirmatively affected the result of trial, or if the error more probably than not affected the judgment to the defendant's prejudice." The high court concluded that the trial court's failure to instruct on misdemeanor assault as a lesser included offense of the primary charge, aggravated sexual battery, was harmless error under Tennessee Rule of Criminal Procedure 52(a).

In <u>State v. Ely</u>, 48 S.W.3d 710, 727 (Tenn. 2001) (emphasis in original), our supreme court clarified the holding in <u>Williams</u> and confirmed that the failure to charge a lesser included offense qualifies as an error of constitutional proportions:

> That the right of trial by jury is of constitutional dimension is evidenced by its embodiment in Article I, section 6 of the Tennessee Constitution, which states, "the right of trial by jury shall remain inviolate." Accordingly, we hold that this constitutional right is violated when the jury is not permitted to consider *all* offenses supported by the evidence.

-16-

See also State v. Bowles, 52 S.W.3d 69, 77 (Tenn. 2001). Our high court directed that in reviewing error arising from a failure to charge one or more lesser included offenses, "the proper inquiry for an appellate court is whether the error is harmless beyond a reasonable doubt." Ely, 48 S.W.3d at 727.

Most recently, in Allen, our supreme court confirmed that "[a]n erroneous failure to give a lesser-included offense instruction will result in reversal unless a reviewing court concludes beyond a reasonable doubt that the error did not affect the outcome of the trial." Allen, 69 S.W.3d at 189. Our high court observed that "[t]he improper omission of a lesser-included offense is analogous to the improper omission of an element of an offense. Omitting an instruction on a lesser-included offense denies the jury the option of rejecting a greater offense in favor of a lesser offense." Id. Moreover, the court ruled as follows:

> Constitutional harmless error analysis does not require harmlessness to be necessarily demonstrated by the jury's verdict. The same reasoning applies to the improper omission of a lesser-included offense. The error may be harmless when the jury "necessarily rejected" all the lesser-included offenses by rejecting an intermediate offense. This analysis does not, however, limit harmless error to cases in which the jury necessarily rejected all other lesser-included offenses.

Id. at 190 (citation omitted). Our supreme court directed that in determining whether the improper omission of a lesser included offense was harmless beyond a reasonable doubt "a reviewing court should conduct a thorough examination of the record, including the evidence presented at trial, the defendant's theory of defense, and the verdict returned by the jury." Id. at191.

Here, the defendant was convicted of the highest crimes with which he was charged, first degree murder and especially aggravated robbery. The jury, therefore, was presented with and declined to exercise its option of convicting on the intermediate offenses of second degree murder and aggravated robbery. The evidence was overwhelming that the defendant, armed and wearing a bulletproof vest, shot each of the victims to death while inside Stacey's Place. It was also clearly established that the defendant took almost half a kilogram of cocaine from the bar. The jury chose to reject the defendant's theory that he shot the victims in self-defense. Under these circumstances, it is our view that the error was harmless beyond a reasonable doubt. See Allen, 69 S.W.3d at 189.

### 2. Necessity and Duress

The Defendant argues that the trial court erred by failing to charge the jury, as requested by the Defendant, on necessity and duress. Portions of the testimony of Brian Whitman, Jason Love, and Dominic Rashad Kellogg form the basis for the Defendant's arguments for instructions on necessity and duress. Whitman testified that the Defendant stated that "they were trying to kill me" as the Defendant exited Stacey's Place following the shootings of the victims. Love testified that while he was incarcerated with the Defendant after the shootings, the Defendant told Love that while waiting for the two victims to return from the kitchen in Stacey's Place, the Defendant heard "something cock," and "he had to do what he had to do." Dominic Rashad Kellogg, another fellow

inmate of the Defendant, testified that the Defendant, presumably referring to the victims, said he "figured that they would get him before he got them."

A trial court has a duty to give a complete charge of law applicable to the facts of the case. State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998). When the trial court instructs fully and fairly, setting forth the applicable law, it is not error to refuse to give a special instruction requested by a party. State v. Bohanan, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987). The test for whether a special instruction must be given is whether "there is any evidence which reasonable minds could accept as to any such [defense] . . . ." Johnson v. State, 531 S.W.2d 558, 559 (Tenn. 1975).

Regarding the defense of necessity, Tennessee Code Annotated § 39-11-609 states that except as provided in §§ 39-11-611 to 39-11-621, conduct is justified if:
> (1) [t]he person reasonably believes the conduct is immediately necessary to avoid imminent harm; and
> (2) [t]he desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-609. "The sentencing commission comments note that the statutory provision codifies the common law defense of necessity and excuses criminal conduct in those exceedingly rare situations where criminal activity is an objectively reasonable response to an extreme situation." State v. Green, 995 S.W.2d 591, 606 (Tenn. Crim. App. 1998). Necessity is generally used when the extreme situation is brought on by something other than a human act. Davenport, 973 S.W.2d at 287 (citing Neil P. Cohen et al., *Prevalence and Use of Criminal Defenses: A Preliminary Study*, 60 Tenn. L. Rev. 957, 966 (1993)). "However, this court has rejected claims of error in a trial court's refusal to charge the defense of necessity in crimes of violence." State v. Marcus A. Terry, No. 02C01-9708-CR-00313, 1998 Tenn. Crim. App. LEXIS 1154, at *16 (Tenn. Crim. App., Jackson, Nov. 6, 1998).

The defense of duress is defined as follows:
> Duress is a defense to prosecution where the person or a third person is threatened with harm which is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death or serious bodily injury if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct.

Tenn. Code Ann. § 39-11-504. "There must be no reasonable means to escape the compulsion to commit the offense." Davenport, 973 S.W.2d at 288.

Moreover, is important to point out that the trial court in this case charged the jury on self-defense as follows:

A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable believe [sic] that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

In our view, the trial court's instruction on self-defense was the appropriate instruction applicable to the testimony of Whitman, Love, and Kellogg.

When read as a whole, the jury instructions in this case fairly submitted the legal issues to the jury. The evidence at trial did not support the defenses of duress or necessity. The evidence presented at trial established that Sammy Garner and Charles Hill were both shot to death and that a large quantity of cocaine was stolen from Garner. The Defendant denied that he was involved in shooting either Garner or Hill. The Defendant denied that he was involved in robbing or stealing from either victim. We fail to see how the Defendant may have committed these acts out of duress or necessity. The evidence does not show that the Defendant "attempted to avoid imminent harm and the desirability and urgency of avoiding the harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct." See State v. Deborah Leigh Goins, 2000 Tenn. Crim. App. LEXIS 158, at *25-*26; see also Tenn. Code Ann. §§ 39-11-504, 39-11-609. This issue is without merit.

### 3. Accessory After the Fact

The Defendant also argues that the trial court erred in failing to charge the jury with the offense of accessory after the fact. However, our supreme court has previously held that the offense of accessory after the fact is a separate and distinct crime from that of the principal offense. State v. Hoosier, 631 S.W.2d 474, 476 (Tenn. Crim. App. 1982) (citing Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). The Defendant was not indicted for accessory after the fact. Thus, the trial court properly refused to submit the issue to the jury as to whether the Defendant was guilty as an accessory after the fact. This issue is also without merit.

### C. Evidence of Pending Aggravated Assault Charge and Ammunition Clip

The Tennessee Rules of Evidence state that all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The Defendant argues that the trial court erred in admitting evidence of a pending aggravated assault charge against the Defendant in which the victim of the alleged aggravated assault was Charles "Bill" Hill, Jr., one of the victims in this case. Specifically, the Defendant argues that the prejudicial effect of the evidence substantially outweighed its probative value. We agree. In our view, this situation is the quintessential example of the proof that Rule 404(b) of the Tennessee Rules of Evidence was designed to prevent.

At the time of the murders, the defendant stood charged with aggravated assault for shooting Charles "Bill" Hill, who was also one of the victims in this case. In 1995, some three years before the shooting in this case, the defendant had allegedly shot Hill in the back. The state sought introduction of the pending charge as proof of the defendant's motive for killing the victims. The trial court permitted the evidence, finding that "it's . . . relevant to show on the question of motive which leads to premeditation." The trial court, however, failed to make a finding that the probative value of the evidence outweighed the possibility of unfair prejudice.

> Rule 404 of the Tennessee Rules of Evidence provides in pertinent part as follows:
> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing inquiry on cross-examination about specific instances of conduct are:
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). A fourth prerequisite to admissibility is that the trial court find by clear and convincing evidence that the defendant committed the other crimes or bad acts. State v. DuBose, 953 S.W.2d 649, 654 (Tenn. 1997). Rule 404 was patterned in great measure on State v. Parton, 694 S.W.2d 299 (Tenn. 1985), wherein our supreme court ruled that evidence of other crimes is generally inadmissible. The terms of this rule establish that character evidence cannot be used to prove that a person has a propensity to commit a crime. Tenn. R. Evid. 404(b); State v. Adkisson, 899 S.W.2d 626 (Tenn. Crim. App. 1994). Most authorities suggest that trial courts take a "restrictive approach of 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[8][e] (4th ed. 2000). That perhaps best explains the traditional posture of the courts that any testimony of prior bad acts by a defendant is not usually admissible when used as substantive evidence of guilt of the crime on trial. Parton, 694 S.W.2d at 302-03. In those instances where the prior conduct or acts are similar to the crimes on trial, the potential for such a result increases. State v. Bordis, 905 S.W.2d 214, 232 (Tenn. Crim. App. 1995).

Exceptions to the rule may occur when the other crime is relevant to an issue other than the accused's character such as identity, motive, common scheme or plan, intent, or absence of mistake. If, however, unfair prejudice outweighs the probative value of the other crime evidence, courts are required to exclude the evidence. State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993); see also State v. Zagorski, 701 S.W.2d 808 (Tenn. 1985); State v. Taylor, 669 S.W.2d 694 (Tenn. Crim. App. 1983). When the trial court substantially complies with the requirements of Rule 404(b), this court will review the trial court's determination for an abuse of discretion. DuBose, 953 S.W.2d at 652.

In admitting evidence of the defendant's pending aggravated assault charge, the trial court failed to find by clear and convincing evidence that the defendant, in fact, shot Charles Hill in 1995. Moreover, the trial court failed to engage in a balancing test to determine whether the probative value of the evidence was outweighed by the danger of unfair prejudice. In consequence, the trial court failed to substantially comply with the requirements of Rule 404(b).

As indicated, the state asserted at trial that the pending charges were relevant to establish the defendant's motive. Motive should not be confused with propensity. Parton, 694 S.W.2d at 303. In State v. Rickman, our supreme court quoted the Delaware Supreme Court with approval:

"[W]e are no more inclined to endorse [the assumption that a defendant's propensity for satisfying sexual needs is so unique that it is relevant to his guilt] than we are to consider previous crimes of theft as demonstrating a larcenous disposition and thus admissible to show proof of intent to commit theft on a given occasion."

876 S.W.2d 824, 829 (Tenn. 1994) (quoting Getz v. State, 538 A.2d 726, 734 (Del. 1988)). We cannot conclude that the defendant's 1995 shooting of the victim Hill demonstrated a motive to shoot Hill some three years later. The similarity of the crimes also militates against the admissibility of the evidence. See Bordis, 905 S.W.2d at 232. Moreover, even if the previous shooting had some minimal relevance to an issue that was before the jury, Rule 404(b) would require the trial court to exclude the evidence as its insignificant probative value is outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b)(3). Thus, the trial court erred by admitting into evidence the pending charges against the defendant. The error was harmless, however, given the overwhelming proof of his guilt. See Tenn. R. App. P. 36(a).

The Defendant also argues that the trial court erred in allowing evidence of a prior confiscation of an ammunition clip from the Defendant. Specifically, The Defendant argues that the evidence, although relevant, should have been excluded because its probative value was substantially outweighed by the danger of unfair prejudice. Investigator Joseph Huckleby testified that he found a .45 Glock magazine containing ten rounds of ammunition in the Defendant's front pants pocket during a security check of a vehicle containing another passenger who had outstanding warrants. The Knoxville Police Department confiscated the magazine. The defense filed a motion in limine to exclude evidence of the magazine clip, arguing that the information was highly speculative and prejudicial to the Defendant's presumption of innocence. The State sought to prove that the ammunition in the magazine clip probably came from the same box as the unfired cartridges found in the weapon discovered on Alcoa Highway. The defense argued that the report was too speculative

and that by introducing evidence of the clip, the Defendant was unfairly prejudiced because the Defendant's prior involvement with police was implied by introduction of the evidence.

After conducting a jury-out hearing, the trial court allowed the State to introduce the testimony of Officer Joseph Huckleby regarding the confiscation of the magazine clip. The trial court stated, "I think the testimony of why [Officer Huckleby] approached the car, that he had a warrant on an occupant of the car, that he patted the people down in the car and found [the magazine] is perfectly proper." In ruling that the evidence concerning the clip was admissible, the trial court stated that because of the circumstances surrounding the confiscation of the clip, Tennessee Rule of Evidence 404(b) was not applicable. The trial court further noted that even if it was applicable, "there's no unfair prejudice and it's clearly relevant." The trial court allowed Officer Huckleby to testify about the confiscation of the clip, but prohibited the introduction of any evidence concerning the smell of marijuana in the car or any legal actions against the Defendant. We find no abuse of discretion by the trial court in determining that the probative value of evidence concerning the clip clearly outweighed any danger of unfair prejudice.

### D. Constitutionality of Sentencing Provisions

The Defendant argues that the trial court erred in failing to declare the sentencing provisions of the Tennessee homicide laws to be unconstitutional. Specifically, the Defendant argues that the trial court erred in allowing the State to use elements of the crime as enhancement factors to increase the Defendant's punishment to life imprisonment without the possibility of parole.

Prior to trial, the State gave notice that it intended to seek life imprisonment without the possibility of parole. The State relied on the following aggravating circumstance to enhance the Defendant's punishment:

> The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb . . . .

Tenn. Code Ann. § 39-13-204(i)(7). First degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." Id. 39-13-202(a)(2). Because the language of the aggravating factor and the language of the first degree felony murder statute are similar, the Defendant argues that the trial court erred by allowing the State to use elements of the offense of felony murder to enhance the Defendant's punishment.

Our supreme court has held that the elements of felony murder may be used to enhance a sentence to life imprisonment without the possibility of parole. State v. Butler, 980 S.W.2d 359, 363 (Tenn. 1998). However, the Defendant argues that Butler should be reconsidered in light of Tennessee Code Annotated § 40-35-114 and the subsequent United States Supreme Court decisions

<u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and <u>Jones v. United States</u>, 526 U.S. 227 (1999). Tennessee Code Annotated § 40-35-114 provides that the listed enhancement factors, "if not themselves essential elements of the offense as charged in the indictment," may be used to enhance a defendant's sentence. However, in <u>Butler</u>, our supreme court addressed the argument that Tennessee Code Annotated § 40-35-114 "reveals the legislature's disapproval of using an aggravating circumstance when the aggravator duplicates an element of the offense." <u>Butler</u>, 980 S.W.2d at 363. The court in <u>Butler</u> stated that a "unique sentencing scheme," <u>id.</u>, is used in first degree murder cases; thus, "the provisions in [Tennessee Code Annotated §] 40-35-114 have no bearing on the sentencing procedures in first degree murder cases." <u>Id.</u> In this case, the Defendant was convicted of two counts of premeditated murder and two counts of felony murder. The trial court merged the felony murder convictions into the premeditated murder convictions. Thus, the trial court sentenced the Defendant for two counts of premeditated murder. This issue is without merit.

Next, the Defendant argues that the aggravating circumstance relied on by the State is unconstitutionally vague because it charges the Defendant with crimes not recognized under Tennessee law. The State relied on the following aggravating circumstance:

> The murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb . . . .

Tenn. Code Ann. § 39-13-204(i)(7). The culpable mental state "knowing" refers to

> a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

<u>Id.</u> § 39-11-302(b). First degree murder is the "premeditated and intentional killing of another." <u>Id.</u> § 39-13-202(a)(2). The culpable mental state "'intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." <u>Id.</u> § 39-11-302(a). The Defendant argues that it was error for the State to be required to prove the culpable mental state of "intentional" to convict the Defendant of first degree murder, but to be required to prove only the less culpable mental state of "knowingly" with regard to the aggravating circumstance. The Defendant argues that the State should not be allowed to enhance the Defendant's punishment by proving a less culpable mental state than is required to prove the underlying offense relied upon by the State in the aggravating circumstance.

We do not find this argument to be persuasive. There is no requirement that an aggravating circumstance include a mens rea "equal" to the mens rea required for first degree premeditated murder. An aggravating circumstance is not necessarily a distinct criminal offense, involving a mens

rea, but is rather a circumstance pertaining to a murder that is deemed by our legislature to warrant a more severe punishment. Furthermore, several of the possible statutory aggravating circumstances contain no language indicating that any mens rea is required. See, e.g., id. § 39-13-204(i)(1),(2),(4),(5),(6),(8),(12). Thus, we conclude that there is no constitutional defect in the enhancement of the Defendant's punishment to life without the possibility of parole for intentionally and with premeditation killing two victims if the jury concludes beyond a reasonable doubt that the Defendant also knowingly killed the victims during an aggravated robbery. This issue is without merit.

The Defendant next argues that his sentence of life imprisonment without the possibility of parole is unconstitutional because it constitutes cruel and unusual punishment. Pursuant to the Eighth Amendment to the United States Constitution, "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The language of Article I, § 16 of the Tennessee Constitution is virtually identical to that of the Eighth Amendment.

The Defendant has failed to cite any authority for the proposition that a sentence of life without the possibility of parole is disproportionate for the offense of first degree murder. Accordingly, this issue is waived. Tenn. R. App. P. 27(a)(7). Regardless, we conclude that the Defendant's contention is without merit. The United States Supreme Court upheld the imposition of a mandatory sentence of life imprisonment without the possibility of parole for a conviction of possession of more than 650 grams of cocaine in the face of an Eighth Amendment challenge. See Harmelin v. Michigan, 501 U.S. 957 (1991). Based on the Harmelin decision, our Court has held that "a sentence of life imprisonment without the possibility of parole for first degree murder would not violate [the Eighth Amendment]." State v. Jack Jay North, Jr., No. 02C01-9512-CC-00369, 1996 Tenn. Crim. App. LEXIS 758, at *91 (Tenn. Crim. App., Jackson, Dec. 9, 1996). Moreover, the Tennessee Supreme Court has held that the death penalty is not a per se violation of Article I, § 16 of the Tennessee Constitution. State v. Black, 815 S.W.2d 166, 187-88 (Tenn. 1991). Therefore, we conclude that the Defendant's sentence is not, per se, cruel and unusual punishment under the Tennessee Constitution. See State v. Jack Jay North, Jr., 1996 Tenn. Crim. App. LEXIS 758, at *9.

### E. Indictment

The Defendant argues that his indictment was constitutionally defective on its face because it failed to allege facts to enhance the Defendant's punishment to life imprisonment without the possibility of parole. Generally, defenses based upon indictment deficiencies must be presented prior to trial. Tenn. R. Crim. P. 12(b), (f). Thus, this issue is waived. Nevertheless, we will briefly address the Defendant's argument.

The Defendant challenges the constitutionality of his indictment based upon the United States Supreme Court decisions in Jones v. United States, 526 U.S. 227 (1999), and Apprendi v. New Jersey, 530 U.S. 466 (2000).

In Jones, the Court construed a federal statute and noted that the constitutional guarantees of due process, notice and trial by jury require that any fact, *other than a*

*previous conviction*, used to enhance a sentence *above the statutory maximum* must be (1) charged in the indictment, (2) submitted to the jury, and (3) proven beyond a reasonable doubt. Jones, 526 U.S. at 243, n.6. In Apprendi, the Court held that the Fourteenth Amendment extends these requirements to cases involving state statutes. Apprendi, 530 U.S. at 476.

State v. James Henderson Dellinger and Gary Wayne Sutton, No. E1997-00196-SC-DDT-DD, 2002 Tenn. LEXIS 207, at *14-*15 (Tenn., Knoxville, May 7, 2002) (emphasis in original).

In this case, the Defendant contends that his indictment failed to comply with the Apprendi requirements because it did not contain any facts alleging aggravating factors used to sentence the Defendant. However, this argument fails because life imprisonment without the possibility of parole is within the statutory range of punishment prescribed by the legislature for first degree murder. See Tenn. Code Ann. § 39-13-204(a). "The Apprendi holding applies only to enhancement factors used to impose a sentence above the statutory maximum." James Henderson Dellinger, 2002 Tenn. LEXIS 207, at *16 (citing Apprendi, 530 U.S. at 481).

The Defendant also argues that the indictment failed to "protect the [D]efendant against double jeopardy." The indictments charged the Defendant with two counts of especially aggravated robbery and two counts of theft of property valued over $1,000. The Defendant argues that in Tennessee, theft has been declared a lesser-included offense of especially aggravated robbery, and as such, theft is incorporated into the elevated charge of especially aggravated robbery and becomes part of this offense. Based on this reasoning, the Defendant argues that charging him with the same offense violates his right against double jeopardy.

Both the United States and Tennessee Constitutions require that an accused be sufficiently informed of the "nature and cause of the accusation." U.S. Const. amend. VI, § 14; Tenn. Const. art. I, § 10; see also State v. Hill, 954 S.W.2d 725, 726-27 (Tenn. 1997). These provisions have been interpreted to require that an indictment:

> (1) provide notice to the accused of the offense charged; (2) provide the court with an adequate ground upon which a proper judgment may be entered; and (3) provide the defendant with protection against double jeopardy.

Wyatt v. State, 24 S.W.3d 319, 324 (Tenn. 2000); see also Hill, 954 S.W.2d at 727; State v. Byrd, 820 S.W.2d 739, 741 (Tenn. 1991).

Tennessee Code Annotated further requires that an indictment

> state the facts constituting the offense in an ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment . . . .

Tenn. Code Ann. § 40-13-202.

The Defendant argues that the jury's verdicts convicting him of especially aggravated robbery and theft violate his right against double jeopardy. The Double Jeopardy Clauses of the United States and Tennessee Constitutions state that no person shall be twice put in jeopardy of life or limb for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. In addition to protecting against a second prosecution for the same offense where the defendant was either convicted or acquitted, this clause has also been interpreted to protect against multiple punishments for the same offense. North Carolina v. Pearce, 395 U.S. 711, 717 (1969), overruled on other grounds by Alabama v. Smith, 490 U.S. 794 (1989); State v. Phillips, 924 S.W.2d 662, 664 (Tenn. 1996) ).

Two indictments were filed against the Defendant. Count two of each indictment alleges felony murder in the perpetration of a robbery, and count five of each indictment alleges felony murder in the perpetration of a theft. These multiple charges all constitute the offense of felony murder. See Tenn. Code Ann. § 39-13-202(a)(2). The Defendant was found guilty of both especially aggravated robbery and theft for the same offense. The Defendant contends that the "multiplication of offenses" caused him unfair prejudice which violated his rights against double jeopardy. However, the two verdicts were merged under one conviction. Thus, the Defendant was subject to only one sentence for especially aggravated robbery. This issue is without merit.

F.  Sufficiency of the Evidence

The Defendant argues that insufficient evidence was presented at trial to convict him of two counts of first degree premeditated murder, two counts of first degree felony murder in perpetration of a robbery, two counts of felony murder in perpetration of theft, one count of especially aggravated robbery, and one count of theft of property valued over $1,000.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant

removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

The Defendant in this case was charged in separate counts with first degree premeditated murder and felony murder of two victims. The jury found the defendant guilty of the premeditated murder and the felony murder of each victim on both counts. The trial court correctly accepted the verdicts, but merged them into a single conviction for first degree murder as to each victim. "[T]he trial court's entry of only one judgment of conviction imposing only one sentence of life imprisonment protects the defendant from receiving multiple punishments for the same offense." State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997). When a merger occurs, proof of either felony murder or premeditated murder is sufficient to sustain the conviction. See State v. Patrick Wingate, No. M1999-00624-CCA-R3-CD, 2000 Tenn. Crim. App. LEXIS 414, at *19 (Tenn. Crim. App., Nashville, May 25, 2000). The defendant in this case, consequently, cannot prevail on his claim that the evidence is insufficient to support his convictions unless sufficient evidence of both felony murder and premeditated murder is lacking. Such is not the case.

We conclude that the jury was presented with sufficient evidence to convict the Defendant of first degree felony murder. Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy . . . ." Tenn. Code Ann. § 39-13-202(a)(2).

Myron Lea Kellogg testified that just two days before the offense, Garner purchased a kilogram of cocaine for $27,000. On the day of the offense, Garner asked Kellogg for a ride because he said that he had a drug deal to make. Senecal Toure Teeter testified that on the day of the offense, Garner stated that he was "about to go make a sale" and left Howe Park.

Brian Whitman testified that on the day of the offense, the Defendant went to Stacey's Place in Alcoa to buy cocaine from Garner. According to Whitman, while he was outside using the phone, he heard four shots. Whitman saw the Hill run outside towards the convenience store; then he saw the Defendant run outside with a plastic bag, which he later found out was full of "dope." Whitman testified that the Defendant sped away from Stacey's Place and led the police on a chase. At some point, Whitman observed a gun in the front seat of the car. Officers found a grocery bag full of cocaine in the car that the Defendant was driving. We conclude that sufficient evidence was presented to convict the Defendant of first degree felony murder in the perpetration of a robbery.

From the above facts, we also conclude that sufficient evidence was presented for the jury to convict the Defendant of especially aggravated robbery. Especially aggravated robbery is an intentional or knowing theft of property from the person of another by violence or by putting the person in fear, "[a]ccomplished with a deadly weapon," id. § 39-13-403(a)(1), and "[w]here the victim suffers serious bodily injury." Id. § 39-13-403(a)(2).

Finally, we conclude that sufficient evidence was presented to convict the Defendant of first degree premeditated murder. First degree premeditated murder is the premeditated and intentional killing of another person. Id. § 39-13-202(a)(1). Once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This Court has also ruled that the jury may infer premeditation from planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

Viewing the evidence in the light most favorable to the State, a jury could have reasonably found that the Defendant killed the victims after the exercise of reflection and judgment. Whitman testified that the Defendant was wearing a bullet-proof vest when Whitman and the Defendant left to go to Alcoa. At the time of his arrest, the Defendant was wearing a bullet-proof vest. Autopsies on the victims revealed that both Garner and Hill died from gunshot wounds. Garner was shot in the top of the head and in the mouth. Hill was shot twice in the back. The jury could have reasonably inferred that the Defendant procured and concealed the murder weapon prior to killing the victims. Having carefully reviewed the record, we conclude that the evidence is sufficient to support the jury's verdict in this case.

### III. CONCLUSION

Although the trial court dismissed the charges of theft and especially aggravated robbery in indictment number 11329, an erroneous judgment was entered in which the trial court found the Defendant guilty of the especially aggravated robbery charge and sentenced him to twenty-five years incarceration. Therefore, the case is remanded to the trial court solely to enter a corrected judgment

in Count III of indictment number 11329.  The judgment of the trial court is AFFIRMED in all other respects.

      _____

      ROBERT W. WEDEMEYER, JUDGE